IDA M. HUMPHREY, Executrix, Appellee, v. EDWARD E. BARON et al., Appellants.

No. 43881.

736

June 15, 1937.

Rehearing Denied October 1, 1937.

Stewart & Hatfield, for appellants, Edward E. Baron and Blanche L. Sibert et al.

Baron & Bolton, for appellant, W. V. Sibert.

David F. Loepp, for appellee, Ida M. Humphrey et al.

Shull & Stilwill, for appellee, Cascade Laundry & Dry Cleaning Company et al.

Kintzinger, J.—Prior to his death, one J. B. Humphrey was the owner of 175 shares, or one-third of the entire stock of the Cascade Laundry & Dry Cleaning Company, of Sioux City, Iowa, hereinafter called the Cascade Laundry. Humphrey died testate in May, 1927, leaving as his sole beneficiary his wife,

Ida M. Humphrey, the plaintiff herein, who is the executrix of his estate.

The evidence shows without conflict that prior to his death the company had been losing about $500 per month in the operations of said laundry.

On June 29, 1927, the plaintiff, as executrix and sole beneficiary of his estate, sold his one-third interest in the Cascade Laundry to W. V. Sibert for the sum of $12,000 and an assumption of decedent's one-third liability on a certain $2,500 note to a bank, the stock to be paid for as follows:

Cash or securities,......................... $6,570.34
The assumption of a one-third liability of
the estate on a joint note of $16,289, or...5,429.66

$12,000.00

Plaintiff contends that at the time of the sale, the defendants, W. V. Sibert, John G. Sibert, and C. F. Noftzger fraudulently represented the value of the entire stock in the Cascade Laundry to be only $36,000, which amount was subject to a deduction of $16,289 upon which the decedent Humphrey was obligated for at least one-third, and alleges that the stock at that time was, in fact, worth about $54,000; she also alleges and the record shows that in October, 1928, the assets and property of the Cascade Laundry were sold to the Mid-Continent Laundries, Inc., for $54,991; she further alleges that the statements made to her as to the value of the stock were untrue, that they were known to be untrue by the defendants, and that she relied thereon when selling said stock to W. V. Sibert, and was, through said false representations, induced to sell said stock at a valuation of $36,000; plaintiff also alleges that although the sale of this stock was made to W. V. Sibert, it was, in fact, purchased by W. V. Sibert for John G. Sibert (now deceased).

The lower court found that false and fraudulent statements inducing the plaintiff to sell her stock were made by the defendants, W. V. Sibert and John G. Sibert (now deceased), and C. F. Noftzger, and entered judgment against W. V. Sibert and the estate of John G. Sibert and the executors thereof in the sum of $6,007.48 as damages therefor, and defendants appeal.

Other parties are named defendants, but the referee and the district court each found that none such other defendants were liable. As no appeal was taken from the ruling as to such

parties, it will be unnecessary to consider any claims made against them, and we refrain from so doing.

The only question to be decided in this case, therefore, is whether or not the defendants, W. V. Sibert and the John G. Sibert estate, or the representatives thereof, are liable in this action for the fraudulent representations alleged to have been made in the purchase of said stock.

I. It appears from the evidence that the only stockholders in this company at the time of Mr. Humphrey's death were J. B. Humphrey, John G. Sibert, and C. F. Noftzger, each of whom owned 175 shares of its entire stock. It also appears that at the time of the sale, Noftzger was president of the Cascade Laundry, and was such president at the time of Humphrey's death. Although the record is silent as to any other officers, it appears that John G. Sibert, deceased, was actively engaged in assisting Mr. Noftzger in the management and control of the company.

It also appears from the record that W. V. Sibert, to whom the plaintiff sold the Humphrey stock, had not been a stockholder or in any manner connected with the Cascade Laundry prior to Humphrey's death.

Appellee contends, however, that at the time of the purchase of the stock by W. V. Sibert, he was representing and purchasing the same for John G. Sibert, whose estate is, therefore, liable for any false and fraudulent statements made by said W. V. Sibert and C. F. Noftzger on behalf of John G. Sibert in the purchase of said stock, and that a fiduciary relationship existed between John G. Sibert, C. F. Noftzger, and W. V. Sibert, on the one hand, and Mrs. Humphrey on the other.

It is not contended that John G. Sibert was present at the time said stock was sold, but that his liability arises only through the acts of W. V. Sibert, as his agent. The record shows that John G. Sibert was not present when the sale was made. Mrs. Humphrey testified that "John G. Sibert was not there—W. V. Sibert was—I asked him where Guy Sibert was, and he said 'I am representing him.' "

■■■ Where an officer or director of a corporation proposes to purchase stock from an individual stockholder, such officer or director occupies a fiduciary capacity towards the stockholder with whom he is dealing, and is in duty bound to disclose evidence bearing upon the value of the stock coming to his knowl-

edge as an officer or director of the company. Therefore, if the evidence discloses that in the purchase of said stock, W. V. Sibert was purchasing said stock for and on behalf of his brother, John G. Sibert, then John G. Sibert and his estate would be liable for fraudulent misrepresentations made in securing the sale of said stock. Dawson v. National Life Insurance Co., 176 Iowa 362, 157 N. W. 929, L. R. A. 1916E, 878, Ann. Cas. 1918B, 230; Bettendorf v. Bettendorf, 190 Iowa 83, 179 N. W. 444.

Likewise, the rule of law is announced in the foregoing cases that if no such relationship exists between the parties, then they may deal with each other severally, precisely as a stranger to the organization might, "even to the extent of intentionally helping others to buy their stock at a mere fraction of its actual value." Dawson v. National Life Insurance Co., 176 Iowa 362, 1. c. 369, 157 N. W. 929, 931, L. R. A. 1916E, 878, Ann. Cas. 1918B, 230.

The executors of the estate of John G. Sibert contend that W. V. Sibert was not acting in any capacity for said John G. Sibert, did not purchase the stock for John G. Sibert, but purchased the same in his own name and for himself. Therefore, if it appears that W. V. Sibert was not purchasing said stock for John G. Sibert and was not acting for him in securing the purchase thereof, then John G. Sibert and the representatives of his estate would not be liable for any false or fraudulent representations made by W. V. Sibert in purchasing said stock.

The evidence shows without conflict that the sale was made to W. V. Sibert, and that the papers were signed at the office of Mr. Corbett, who was the attorney representing Mrs. Humphrey, as execututrix of her husband's estate. The record shows without dispute that the only persons present at the time this sale was made and at the time the papers were signed were the plaintiff, Mr. Corbett, her attorney, W. V. Sibert, and C. F. Noftzger, president of the company. As to what took place at that time with reference to representations as to the value of the stock, Mrs. Humphrey testified:

"I thought sure I would see some papers or books * * *, but nothing was shown to me, but * * * the deal was over and I was just supposed to sign, and I said, 'How do I know the value of this stock?', and they said I could take their word for it, and when I got the notes and cash I said, 'Is that all I get?'

\* \* \* 'Shouldn't the books be audited, or shouldn't I go over them?' They said that had all been done, the books had been audited by Mr. Harrison \* \* \*, and there was no need to go over them again. \* \* \* They said that was one-third of the value, \* \* \* as shown by this audit.

"Q. Did they indicate or state that the settlement you got was supposed to be one-third of the value as shown by that audit? A. *That is what they told me, that I could take their word for it.*" (Italics ours.)

The testimony shows that at the time Mrs. Humphrey sold the stock to W. V. Sibert, W. V. Sibert and C. F. Noftzger came to Corbett's office when the papers were prepared. Up to that time and until Mrs. Humphrey came into his office, with W. V. Sibert and C. F. Noftzger, Corbett knew nothing about the sale of the Humphrey stock. They told Corbett about the terms of the sale, and he prepared the papers while they waited. ▌▌▌ The only testimony in the entire record tending to show that W. V. Sibert was in any manner acting for, or purchasing the stock for his brother, John G. Sibert, is the testimony of Mrs. Humphrey when she said that W. V. Sibert said "he was representing John G. Sibert." This testimony was objected to as being incompetent, irrelevant and immaterial, because it is the voluntary statement of a person saying that he was agent for another, and is not competent to bind the person he is claiming to represent. The declarations of an agent are not admissible to prove the fact of agency. Clanton v. Railway Co., 67 Iowa 350, 25 N. W. 277; Gund Brewing Co. v. Peterson, 130 Iowa 301, 106 N. W. 741; Lavelleur v. Nugent, 186 Iowa 234, 172 N. W. 197; Huismann v. Althoff, 202 Iowa 70, 209 N. W. 525.

In Clanton v. Railway Co., 67 Iowa 350, l. c. 352, 25 N. W. 277, 278, this court said:

"Ball's acts and declarations would not be made available as evidence of his agency in any stage of the trial, and the jury should have been plainly and explicitly directed that they must not consider any of Ball's acts, conversations or conduct as tending to show that he was defendant's agent."

In Lavelleur v. Nugent, 186 Iowa 234, l. c. 238, 172 N. W. 197, 198, this court said:

"There was a clear controversy as to Burnett's agency. It is fundamental that agency cannot be proven by the declaration of the agent. Evidence of statements made by Burnett that he was the agent of defendant and acting for him in the buying of horses was, therefore, wholly incompetent."

At the time of the sale, W. V. Sibert was not in any manner connected with the management or control of the Cascade Laundry. He lived at Waterloo, but shortly after purchasing said stock, moved to Sioux City and took charge of the laundry. Mrs. Humphrey's testimony that W. V. Sibert said he was representing John G. Sibert was incompetent, and should not have been considered. Her statement, however, would not necessarily prove that W. V. Sibert purchased this stock for John G. Sibert. Other testimony tends to show that the stock in question was purchased by W. V. Sibert for himself. Mrs. Humphrey admitted that she never had any direct conversation with John G. Sibert about it. She admits selling to W. V. Sibert by the written agreement of sale which is substantially in the following language:

"This Agreement made * * * this 29th day of June, 1927, by and between Ida M. Humphrey in her individual right and as Executrix of the Estate of James B. Humphrey, deceased, party of the first part, and W. V. Sibert of Waterloo, Iowa, party of the second part:

"Witnesseth: * * *

"Whereas, said party of the first part desires to sell all interest which she as such Executrix and as such residuary legatee owns, and

"Whereas, *the said party of the second part desires to buy said stock* in the said Cascade Laundry, and

"Whereas, the said James B. Humphrey was owing a promissory note at the First National Bank of Sioux City, Iowa, on which there is a balance * * * of $16,289.00, said note being signed jointly by the said James B. Humphrey, C. F. Noftzger, and J. G. Sibert, and dated February 23, 1927, and

"Whereas, the share (of the obligation) of the estate of * * * James B. Humphrey is recognized * * * as $5,429.66;

"Now, Therefore, it is mutually understood and agreed by and between the parties hereto that said party of the first part does hereby sell and assign over to party of the second part

\* \* \* said 175 shares of stock in the Cascade Laundry \* \* \*, and being all of the interest \* \*·\* James B. Humphrey \* \* \* owned in said property \* \* \* and the said party of the second part does hereby agree to pay party of the first part \* \* \* Twelve Thousand Dollars ($12,000) represented as follows, to wit: $5,429.66 the portion of the note due to the First National Bank \* \* \* ; Cash (and securities) in the sum of \* \* \* $6,570.34 \* \* \*.

"It is further \* \* \* agreed \* \* \* that whereas the said James B. Humphrey was liable under the terms of said $16,289 note to the First National Bank for all of the sum which might be due upon it, that said second party does hereby agree to assume said note, to the extent that the first party hereto is relieved from any responsibility thereon;

"It is further \* \* \* agreed \* \* \* that there is a $2500.00 note due to the First National Bank \* \* \* signed by L. W. Travers, J. G. Sibert, C. F. Noftzger, and James B. Humphrey, which \* \* \* represents primarily the indebtedness of the said Travers to the First National Bank;

"That second party agrees, \* \* \* that he will relieve the party of the first part from any liability upon that note of $2500.00; \* \* \*

> "[Signed]    Ida M. Humphrey,
> as Executrix of the Estate of James B. Humphrey, Deceased.
> "Ida M. Humphrey.
> "W. V. Sibert."

(Italics ours.)

In addition to said agreement, Mrs. Humphrey, on June 29, 1927, also executed the following written assignment of her stock, to W. V. Sibert:

"Sioux City, Iowa, June 29, 1927.

"For Value Received, I, Ida M. Humphrey \* \* \*, do hereby *sell, assign and set over to W. V. Sibert of Waterloo,* Iowa, One Hundred Seventy-five shares (175) of the Cascade Laundry Company of Sioux City, Iowa, \* \* \* and said corporation is hereby authorized, empowered and ordered to assign said 175 shares of the capital stock of the Cascade Laundry to W. V. Sibert.

> "[Signed]    Ida M. Humphrey."

(Italics ours.)

On February 9, 1928, Mrs. Humphrey also signed a written application to the court for an approval of the *sale of her stock to W. V. Sibert,* upon the terms set out in the written agreement to sell, as follows:

"The undersigned, Ida M. Humphrey * * * states * * * that at the time of his death the decedent was the owner of * * * 175 shares of stock of the Cascade Laundry * * * .

" * * * that this executrix felt * * * that it was to the advantage of the estate to sell said stock, and on the 29th day of June, A. D. 1927, she entered into a contract with W. V. Sibert of Waterloo, Iowa, agreeing to sell him said 175 shares of stock in the Cascade Laundry * * * ;

" * * * that she has made thorough investigation concerning the condition of the corporation at the time of the death of the decedent, and after full investigation she is now fully satisfied that that sale was an advantageous one to the estate and to her as the residuary legatee, and * * * she now desires an order of this Court approving and confirming said sale and assignment of the stock above mentioned, and she recommends to this Court that such order be granted herein.

(Signed and sworn to by Ida M. Humphrey before E. M. Corbett, Notary Public.) "

Thereupon, on February 9, 1928, the court "ordered, adjudged and decreed that the assignment and sale of said stock of 175 shares in the Cascade Laundry * * * on June 29, 1927, be approved and confirmed."

Without setting out the evidence in further detail, it is our conclusion that the sale of the stock owned by Ida M. Humphrey was made to W. V. Sibert and not to John G. Sibert. It necessarily follows that John G. Sibert or his estate cannot be held liable for any statements or representations made by W. V. Sibert.

It may be conceded that C. F. Noftzger was present at the time the Humphrey stock was sold to W. V. Sibert, and that he may have made representations which might have induced Mrs. Humphrey to sell her stock, but there is no testimony in this record tending to show that John G. Sibert was in any manner accountable for or conspired with said Noftzger in making such representations to Mrs. Humphrey for the purpose of inducing her to sell her stock to W. V. Sibert.

It is, therefore, our conclusion that the estate of John G. Sibert and the executors thereof are not liable to the plaintiff herein for any damages sustained by her in the sale of said stock. It necessarily follows that the court erred in rendering judgment against the estate of John G. Sibert and the executors thereof.

II. From what has been said in the preceding division of this opinion, it is apparent that the false statements alleged to have been made for the purpose of inducing Mrs. Humphrey to sell her stock in the Cascade Laundry at a valuation of $36,000 were participated in by the defendant, W. V. Sibert. If said statements were untrue, and if Mrs. Humphrey relied thereon in making the sale, and if they were fraudulently made for the purpose of inducing said sale, then the defendant W. V. Sibert would be liable for damages resulting from such fraudulent statements.

As shown, by the facts heretofore related, Mrs. Humphrey was told by W. V. Sibert and C. F. Noftzger that the valuation of the stock of the Cascade Laundry was based upon an audit of the company's books made on the last day of May, 1927, and less than a month preceding the date of the sale of her stock.

By such statements, Mrs. Humphrey was led to believe that the net value of the entire stock was approximately $36,000, from which, however, should be deducted an obligation of $16,289 on a note signed by Mr. Humphrey, C. F. Noftzger, and John G. Sibert; and another note of $2,500 signed by the same parties with a Mr. Travers. The evidence, however, shows that this latter obligation was incurred on a personal indebtedness of Mr. Travers, and in the sale of the stock, the Humphrey obligation thereon was assumed by W. V. Sibert.

It, therefore, appears from the evidence that Mrs. Humphrey was led to believe that the net value of the entire stock was $36,000, and that she was chargeable with one-third of the obligation due on a note of $16,289 signed by Humphrey, Noftzger, and John G. Sibert.

It appears, however, from an audit of the company's books, made by a Mr. M. L. Harrison, and upon which W. V. Sibert and C. F. Noftzger based their conclusion and representations, that the net value of the entire Cascade Laundry stock was $51,333.55.

■■■ There being no evidence of the market value of the

stock, its value must be ascertained by evidence showing the value of the net assets of the company. This would be the difference between the amount of its assets and liabilities.

The only evidence of such value given to Mrs. Humphrey was the statements and admissions made to her by W. V. Sibert and Mr. Noftzger, the president of the company, that the net value of the entire stock was $36,000, and was based upon an audit of the books of the company made by Mr. M. L. Harrison in May, 1927. The only evidence of such value is shown by a letter from M. L. Harrison, the auditor, to John G. Sibert, dated February 7, 1928, in which Harrison said that:

"When I was called on to state the value of the plant I said roughly that it was worth about $36,000 net in the event of disposition being made of the stock."

The figures given in arriving at this estimate were as follows:

"Capital stock and surplus May 31, 1927,...$57,022.44
Bad debts estimated at.................. 3,000.00

Leaving........$54,022.44"

Then he says:
"The losses up to May 31 were............ 2,688.89

This left........$51,333.55"

This audit, therefore, shows a net value of the entire capital stock, after deducting bad debts and losses, to be $51,333.55. Mr. Harrison, however, in the letter written sixteen months after the sale of this stock to W. V. Sibert, attempts to justify a further deduction of $16,116.11 for a certain depreciation charged off by the King Hamilton Laundry when that company was purchased by the Cascade Laundry. In his letter he says that depreciation was absorbed by the new organization. He evidently makes this deduction for the purpose of justifying his statement that the entire stock was worth approximately $36,000. We find, however, no evidence in the entire record of any depreciation that was charged off by the King Hamilton Laundry which was absorbed by the new organization. Neither do we find any evidence in the entire record of any depreciation in the assets of the capital stock of the Cascade Laundry resulting from the depreciation alleged to have been charged off by the

King Hamilton Laundry. As shown by the Harrison audit, he gives the value of the capital stock and surplus of the Cascade Laundry as $57,022.44, and then after deducting $3,000 and $2,688.89 for bad debts and losses, he shows a net valuation of $51,333.55 of the capital stock of the Cascade Laundry. We find no justification in this record for any deduction for any depreciation charged off by the King Hamilton Laundry.

Upon this question the lower court in its ruling said:

"The court finds at no place in any of the records or in any of the record oral or written that there had ever been any depreciation charged off by the King Hamilton Laundry which was absorbed in the new organization."

It is our conclusion, therefore, that from the admissions made by the letter appearing in evidence from M. L. Harrison, with reference to the audit made by him shortly prior to the sale to W. V. Sibert, the net value of the entire stock at that time was $51,333.55.

The record shows, however, that the Humphrey estate was indebted on a note signed by Mr. Humphrey, C. F. Noftzger, and John G. Sibert, to a bank in Sioux City for $16,289. In the agreement for the sale of her stock, it was agreed that one-third of the Humphrey obligation on this amount should be deducted from Mrs. Humphrey's share of the net value of the Cascade Laundry stock, and that the Humphrey estate be released from any further obligation thereon.

It is, therefore, our conclusion that the net value of Mrs. Humphrey's share of the capital stock of the Cascade Laundry was one-third of $51,333.55, or $17,111.18 instead of $12,000 as represented by W. V. Sibert and Noftzger. The damage sustained by Mrs. Humphrey as a result of the fraudulent misrepresentations is the difference between $17,111.18 and $12,000, which is $5,111.18, for which amount she is entitled to judgment against W. V. Sibert, with interest at six per cent from June 29, 1927.

In addition to the estimated value shown by the Harrison audit, the evidence also shows that the property of the corporation was sold to the Mid-Continent Laundries, Inc., in October, 1928, for $54,991. The Harrison audit was made May 31, 1927, and Mrs. Humphrey's stock was sold within a month thereafter.

Other evidence of the value of Mr. Humphrey's stock in the Cascade Laundry is shown by a statement to the Sioux National Bank, dated March 5, 1927, giving Mr. Humphrey's financial condition at that time. Therein he values his one-third interest in the Cascade Laundry at $30,000, without any offset against it on his joint or one-third liability upon the $16,289 note to the bank. This evidence may not be of much probative force, but it tends to show that the Humphrey stock was of a greater value than $12,000.

It is our conclusion that the statements made by W. V. Sibert and Mr. Noftzger as to the audit showing the value of the entire stock to be only $36,000, were untrue. It is also our conclusion that the plaintiff relied upon such false statements and that they were made for the purpose of inducing her to sell her stock for less than the value shown by said audit, and were known to be untrue by said W. V. Sibert and Mr. Noftzger.

For the reasons hereinabove expressed, the judgment of the lower court against the estate of John G. Sibert, deceased, and the executors thereof, is reversed, and the judgment against W. V. Sibert is modified and affirmed as hereinabove set out. The case is remanded for a decree in harmony herewith.—Reversed in part; modified and affirmed in part.

RICHARDS, C. J., and DONEGAN, PARSONS, HAMILTON, STIGER, and SAGER, JJ., concur.

ANDERSON, J., took no part.