KATHERINE SNYDER, Appellee, v. COLWELL CO-OPERATIVE
GRAIN EXCHANGE, Appellant.

No. 45673.

MAY 5, 1942.

Larson & Carr, for appellant.

Campbell & Campbell, for appellee.

STIGER, J.—On and prior to September 14, 1936, plaintiff was the owner of four shares of stock in the Colwell Grain Exchange, a corporation organized for pecuniary profit but operated as a co-operative for several years. At a directors' meeting held September 14, 1936, it was decided to reorganize as a co-operative association under chapter 390.1.

Section 8512.05 of said chapter reads:

"8512.05 Permissible organizers. Five or more individuals, or two or more associations, may organize an association. All individual incorporators of agricultural associations must be engaged in producing agricultural products, which term shall include landlords and tenants as specified in section 8512.13."

Section 8512.13 provides in part that farm tenants and landlords who receive a share of agricultural products as rent may be made eligible to membership in agricultural associations as producers.

The minutes of the meeting read in part:

. "Upon motion by Raisty seconded by Merrick it was unanimously agreed to reorganize under the 1935 cooperative laws. Since this would make it necessary to purchase non-resident shares Mr. Raisty made the motion to offer $12.50 to those non-residents who chose to dispose of their shares at that price. Mr. Fix seconded the motion and it carried. The secretary to transfer all such shares offered into the corporation's treasury and authorize payment for same."

Pursuant to this action of the directors, the following letter was sent to all nonresident and nonproducer shareholders, including plaintiff, in the fall of 1936:

"COLWELL GRAIN EXCHANGE
COLWELL, IOWA

Pres. Dick Cummings
Secretary, W. E. Fix
To Non-Resident and Non-Producer Shareholders,
Colwell Grain Exchange,
Colwell, Iowa,
Dear Sir:

At the last annual meeting of the stockholders of the Colwell Grain Exchange a plan was made to reorganize our company and renew our charter which expired last year. This plan is in conformity with the principles of the new cooperative law passed by the last General Assembly and limits all memberships to actual producers living in the territory served by our elevator.

At a subsequent meeting held by the board of directors, a value of $12.50 per share was placed on all outstanding stock

and the secretary was authorized to purchase all such shares available at that price. In most cases the original shares were purchased at par value which was $25 but since the 100% stock dividend issued in July 1919, they represent an investment equal to the amount offered at the present time. The board of directors feels that this value is consistent with the best interests of both the stockholders and the corporation.

If you care to transfer your shares back to the corporation at this price, please mail your certificates, properly signed for transfer on the back, to the office of the company and a check will be mailed to you for the amount specified.

This offer is limited to the time when the new charter is requested consequently it will be necessary to send your certificates in as soon as possible. In case you have lost or misplaced your certificates, please let us know at once and the proper affidavit for transfer will be mailed you without delay.

Yours truly,

Dick Cummings, President.

W. E. Fix, Secretary.''

Plaintiff delivered the letter and her stock to her attorney with instructions to sell the stock to the corporation for $12.50 a share, or $50. This was done and defendant paid $50 to plaintiff for her stock. There were 488 shares of stock outstanding at this time. An auditor's report covering the period from June 1, 1936, to May 31, 1937, showed the value of the net assets of the corporation was $19,495.19. This report was accepted by the company. The stock had no market value and it was proper to determine its real value by showing the value of the net assets of the corporation. Humphrey v. Baron, 223 Iowa 735, 273 N. W. 856. On this basis the stock was worth at the time of the sale approximately $40 per share.

At a meeting held on July 15, 1937, the stockholders voted to reorganize as a co-operative. A balance sheet taken from the auditor's report was presented to the stockholders at the meeting showing the value of the net assets to be $19,495.19. This sheet also stated there were then outstanding 317 shares of stock and that its value was $61.49 per share. One hundred and seventy-one shares had been purchased by the corporation at $12.50 per share from September 1936 to July 14, 1937.

Nonresident stockholders, who voted "No" on the proposition, were paid $61.49 per share for their stock.

When plaintiff learned that the corporation admitted the stock was worth $61.49 on July 15, 1937, and had purchased stock for $61.49, she commenced this suit.

 Plaintiff testified that she understood from the letter that she was "supposed to get out of the corporation," and she relied on the statements in the letter in selling her stock at $12.50 per share. Defendant concedes it made a profit on plaintiff's stock. A fiduciary relationship existed between the managing officers of the corporation and its stockholders and it was their duty to make a full disclosure to plaintiff of all the facts known to them bearing on the value of her stock. Dawson v. National L. Ins. Co., 176 Iowa 362, 157 N. W. 929, L. R. A. 1916E, 878, Ann. Cas. 1918B, 230; Humphrey v. Baron, 223 Iowa 735, 273 N. W. 856. Plaintiff was justified in her belief, based on the letter, that the real value of her stock was $12.50 per share. It is conceded there were 488 shares of stock outstanding when plaintiff sold her stock in the fall of 1936, and that the value of the net assets of the corporation, shown by the auditor's report for the fiscal year ending May 31, 1937, was $19,495.19.

 Defendant's main contention is that its statement in the letter that the stock had a value of $12.50 per share was justified because if the stockholders did not vote to reorganize as a co-operative the corporation would be liquidated, and if the property were "sold under the hammer" the stock would be worth "at least" that amount.

The secretary of the corporation testified:

" * * * I was instructed to [write the letter]. The question of value came up at that time. That was necessarily a sort of a shot in the dark. It all depended on whether we could re-organize. * * * Didn't have any way of knowing because it all depended on this re-organization and how we could re-organize and how many voted 'no' and took their shares out. There was a lot of things that figured in there outside of our actual value of the stock, buildings and things. We didn't think it might be worth less than $12.50. We figured that it would be worth at least $12.50. I didn't have at that time a statement

of the assets and liabilities of the company. * * * Their value all depended on whether or not we reorganized. That is why I say we took a shot in the dark, because it all depended on whether or not we could reorganize or whether we would have to call an auction and sell our equipment under the hammer. That would make a considerable difference. * * * As I stated before, we estimated the value at $12.50 a share providing unknown circumstances developed. We didn't know what was going to develop. Well that was of necessity low enough so that we were protecting ourselves. It was probably a little under the actual value if we had sold everything out but we didn't know what was going to happen or what kind of a sale we would have.''

The president of the corporation testified:

''The value was arrived at in various ways. The first buyers of the Colwell Grain Exchange paid $25.00 a share. Then in 1919 or 1920 the board of directors issued a stock dividend of $25.00, 100% and also 5% and we figured that there was a number of people at that time that wanted to sell out. We figured that by giving them $12.50 a share, if they bought one share and had one given to them that would make $25.00 and they would get back the original purchase price of what they paid in to the elevator. Many of them were non-producers. * * * The directors placed a value of $12.50 on the stock. * * * We considered that it was still the fair value. We didn't send the letter to all of the members of the corporation because when you organize under the laws of Iowa you can exclude them because these people were [not] producers in that trading area.''

The letter sent out by authority of the board of directors did not disclose to plaintiff that the value of $12.50 per share would be the value of the stock if the stockholders refused to reorganize and the property were sold under liquidating proceedings. It stated that $12.50 was the real value of the stock at the time the letter was written. It did not advise her it was the opinion of the directors that the value of the stock would depend upon the result of the vote at a stockholders' meeting on the question of reorganizing the corporation, or, that if the plan were adopted the stock would be worth a far greater value.

It did not state the approximate book value of the stock. It did not advise her that there would be a future meeting of the stockholders to vote on the plan.

It was the opinion of the president and secretary at the time the letter was mailed that plaintiff was entitled to membership in the new corporation as a producer because she was a resident owner. The secretary testified:

"I brought up the question of whether or not we should send her [plaintiff] a letter because she was a resident owner and it was my opinion that she should stay in the company and continue her shares as long as she had a farm within about 3½ miles of this place. * * * we talked about who were the real resident owners and who were not and I think it was during that time that I mentioned the fact that Mrs. Snyder was a resident owner and I was instructed to send her a letter anyway and it went out, I believe, the same time as all the form letters."

The letter was addressed to nonresidents and nonproducer shareholders and plaintiff testified she understood from the letter she could not continue in the corporation. Plaintiff's conclusion was a reasonable inference. The letter did not advise her that she was eligible to membership in the new corporation.

Plaintiff claims the letter was part of a scheme to "freeze out" nonresidents to enable the resident producers to organize as a co-operative. It is quite apparent that the resident producers owned a large majority of the stock, and, so far as shown by the evidence, the corporation was in sound financial condition. A fair inference from the record is that a defeat of the plan to reorganize by the stockholders was rather improbable.

But, disregarding the motive of the corporation in sending out the letter, we find the defendant did not perform its fiduciary duty to plaintiff, and are in full accord with the finding of the trial court that "said transaction whereby the defendant acquired plaintiff's said four shares of stock resulted in a constructive fraud upon the plaintiff to her damage in the amount of $12.00 per share."

Defendant established that during the fiscal year from June 1, 1936, to May 31, 1937, it suffered a loss of $2,500 which

was not discovered during said period. The court considered this loss in determining the value of the assets of defendant at the time of its purchase of plaintiff's shares of stock, which it fixed at $12,000. It adjudicated the value of the stock at said time to be $24.50 per share.

We are satisfied that the trial court placed a very conservative value on the assets of defendant and the value of its stock on the day of sale, and defendant has no cause for complaint on this issue.—Affirmed.

BLISS, C. J., and MILLER, SAGER, GARFIELD, WENNERSTRUM, HALE, and MITCHELL, JJ., concur.