In re the MARRIAGE OF Mary E. MOFFATT and Lynn U. Moffatt.

Upon the Petition of Mary E. Moffatt, Appellee,

And Concerning Lynn U. Moffatt, Appellant.

No. 62017.

Supreme Court of Iowa.

May 30, 1979.

W. Don Brittin, Jr. of Nyemaster, Goode, McLaughlin, Emery & O'Brien, Des Moines, for appellant.

Maynard S. Telpner, Council Bluffs, for appellee.

Considered by LeGRAND, P. J., and REES, UHLENHOPP, McCORMICK and McGIVERIN, JJ.

McCORMICK, Justice.

This is an appeal by respondent Lynn U. Moffatt, Jr., from the economic provisions of a dissolution decree. Lynn contends that the trial court overvalued his net assets and consequently made excessive property and alimony awards to petitioner Mary E. Moffatt. He also challenges the court's order that he pay college expenses for four of his children and the court's refusal to allow him credit against a temporary support delinquency for payments allegedly made in behalf of Mary and the children. Mary asks us to award attorney fees for the appeal. We modify the trial court's decree and affirm it as modified. We also award attorney fees to Mary.

I. *The valuation dispute.* The trial court found the parties had net assets worth $690,849.15. The assets consist of cash, certificates of deposit, life insurance, E bonds, farm machinery, livestock, grain and stock in two close corporations. Liabilities consist of debts on various accounts, notes, encumbrances on farm machinery, and cash and grain advances from a farm corporation. Lynn contends his net assets do not exceed $74,000.

The trial court did not explain its computation, and the basis for it does not readily appear in the record. We recognize that the trial court was provided confusing and unsatisfactory evidence from which to attempt to identify the assets and liabilities of the parties. However, we have the same problem on review and, while we sympathize with the plight of the trial court, would have been aided if the court had shown the basis of its analysis.

Most of the information regarding assets and liabilities came from Lynn. He was the only person in a position to provide much of it. Some of the data is substantiated by documentation or other testimony. Some depends entirely upon his credibility. In arriving at its valuations of assets and liabilities, the trial court found that "the fi-

nancial information presented by the respondent is lacking in credibility, and in all probability the respondent, from his attitude as shown in the courtroom and as shown in his failure to answer interrogatories or produce information, has minimized and falsified his true value or net worth."

We review the record de novo. Nevertheless we give weight to the findings of fact of the trial court, especially when credibility is involved.

Lynn's conduct during the pendency of trial court proceedings can most charitably be described as recalcitrant. Most notably he refused to cooperate with discovery procedures through which Mary sought to obtain disclosure of his financial situation. The action had been pending for eighteen months and Lynn was on his third lawyer at the time of trial. The case was tried in installments, on December 21, 1977, January 26, 1978, and February 7, 1978, largely because of Lynn's failure to comply with court discovery orders. It was not until the last day of trial that he produced vital information about his claimed liabilities, and much of that information was sketchy and uncorroborated.

His present counsel, who did not represent Lynn in the trial court, argues that the record shows Lynn was uncooperative but does not show he was dishonest. Counsel also asserts that the evidence was largely uncontradicted and must be accepted as true.

Lack of cooperation with discovery provides a basis for sanctions. *White v. Citizens National Bank of Boone,* 262 N.W.2d 812, 816 (Iowa 1978) ("We hold trial courts have inherent power to enforce our discovery rules and have discretion to impose sanctions for a litigant's failure to obey them."). But sanctions were not imposed in this case. Rather, the trial court found that Lynn's attitude reflected adversely on the credibility of his testimony. We believe the court was entitled to consider Lynn's conduct and demeanor in assessing his credibility. Among the relevant factors in deciding credibility are the frank-

ness, or lack thereof, and the general demeanor of witnesses. *Wiese v. Hoffman,* 249 Iowa 416, 424, 86 N.W.2d 861, 867 (1957). The trial court's observations were well-founded in the present case.

■ Furthermore, the testimony of a witness need not be believed merely because it is uncontradicted. *Moser v. Brown,* 249 N.W.2d 612, 616 (Iowa 1977).

The record presents three main areas of valuation dispute. They concern the worth of Lynn's interests in the two close corporations and the extent of his liabilities to one of them.

A. *Valuation of Lynn's stock in the Moffatt Corporation.* One of the corporations is Moffatt Corporation which owned 640 acres of farm land, livestock, grain, and farm equipment. This corporation was formed by Lynn's parents in 1973 as a means of passing their farm to Lynn and his sister, Mary Margaret Freeburne. The corporation issued 200,000 shares of stock. The parents made lifetime gifts of some of it equally to Lynn and his sister. Both parents died in 1976, leaving the remaining stock to the children equally. Thus Lynn and his sister each owned 100,000 shares at the time of trial. They comprised the board of directors of the corporation.

A by-law of the corporation gave it a right of first refusal before any gift, sale or bequest of the stock to another person. In that event the corporation through its board of directors had the option for thirty days to purchase the stock at a price fixed annually by the stockholders. This provision was intended to prevent sales of the stock outside the Moffatt family. The last option price had been fixed in 1975 at $1.45 per share. From this, Lynn contends his interest in the corporation did not exceed $145,000 because that is all the corporation would have to pay him if he wished to sell his 100,000 shares.

Mary contends the stock should be valued based upon the net worth of the corporation. She testified that the 621.6 acres actually comprising the farm were worth $1500 an acre, resulting in a value of $466,200 for Lynn's interest.

Although we do not have a full picture of the assets and liabilities of the corporation, the land is free of debt, and its machinery and inventory of livestock and grain are worth more than the encumbrances against them. Therefore, valuing the corporation's net assets at the worth of the land it owns appears to be a conservative approach. Moreover, we believe Mary's opinion concerning the land's value is not out of line.

■ Lynn's argument that the trial court was bound by the $1.45 per share figure has serious flaws. Under the terms of the by-laws the option price is to be fixed annually by agreement of the shareholders or by appraisal. No price was fixed in 1976 or 1977. Therefore the option price which would govern in 1978 had not been established.

Furthermore, Lynn's argument assumes the corporation would exercise its option. It did not do so when the elder Moffatts made gifts of the stock to Lynn and his sister and later bequeathed the remainder to them. At that time the elder Moffatts were the directors and it is unlikely they would have disagreed as directors with what they wished to do as stockholders. The same is true in the present situation. Because Lynn and his sister are the sole directors and have an amicable relationship, it is unlikely one of them would do anything as a director which would cause financial disadvantage to the other as a stockholder. More important, because they have equal voice as directors, the corporation could not exercise its option of first refusal without concurrence of both of them. Therefore, as a practical matter, Lynn is not limited to the option price if he should desire to sell his stock. Nor is the court limited to that price in determining the stock's value for purposes of this action.

We conclude that the 1975 option price is merely one factor to be considered in determining the value of Lynn's 1978 interest in the Moffatt Corporation and is not determinative.

■ Lynn has requested that the record be supplemented by an affidavit showing the value of the stock agreed upon by the internal revenue service for federal estate tax purposes in his parents' estates. We reject this evidence for two reasons. First, as a court of review we must ordinarily limit our consideration to the record made at trial or in supplementary proceedings upon limited remand. The affidavit is not part of that record and cannot now be made part of it. Second, we are not bound by the figure agreed to by the internal revenue service and it would be entitled to little or no weight in this adversary proceeding, where the valuation is based upon different information and has a different purpose.

■ The general rule is that stock should be valued at market value if it can reasonably be ascertained. However, market value for the stock in a close corporation can rarely be ascertained. Thus its intrinsic value should be determined. A broad range of evidence is admissible to prove any fact calculated to affect its value. This includes evidence of the assets and liabilities of the corporation. *See Moffitt v. Hereford,* 132 Mo. 513, 518, 34 S.W. 252, 253 (1896) ("This value may depend [upon] many facts and circumstances, such as the value of the property and assets owned, the dividends paid, the character and permanency of the business, the control of the stock, the management, the markets for articles produced, if a manufacturing concern, and other facts."); 29 *Am.Jur.2d Evidence* § 390 (1967).

Valuation of stock in a close corporation based upon the corporation's net assets was approved in *Humphrey v. Baron,* 223 Iowa 735, 273 N.W. 856 (1937). This factor is also significant in internal revenue service appraisals in analogous situations:

The value of the stock of a closely held investment or real estate holding company, whether or not family owned, is closely related to the value of the assets underlying the stock. For companies of this type the appraiser should determine the fair market value of the assets of the company. . . . For these reasons, adjusted net worth should be accorded greater weight in valuing the stock of a closely held investment or real estate holding company, whether or not family owned, than any of the other common yardsticks of appraisal, such as earnings and dividend paying capacity.

Rev.Rul. 59–60 § 5(b), 1959–1 C.B. 243.

■ We need not arrive at an exact value. The purpose of determining value is to assist the court in making equitable property awards and allowances. This can be done without putting a precise value on the stock of a closely held corporation. *See Riemenschneider v. Riemenschneider,* 239 Iowa 617, 30 N.W.2d 769 (1948).

Under the record in the present case we believe Lynn's interest in the Moffatt Corporation is much closer to the value asserted by Mary than that urged by Lynn.

We give some weight to the fact that in a financial statement prepared for the parties by an accounting firm to show their financial situation on March 31, 1976, the value of Lynn's 19,000 shares of stock in the Moffatt Corporation was shown as $57,600. This report was prepared for use in obtaining financing for their construction company and was based upon information furnished by Lynn. This is some indication that the 100,000 shares he owned in 1978 were worth more than $145,000 as asserted by him.

We also consider the fact that at trial he listed personal liabilities to the corporation for cash and grain advances of $140,396.83. This amount was not listed as an asset of the corporation. If it is owed, the value of his stock is further enhanced.

Upon the entire record, we find his interest in the Moffatt Corporation is worth not less than $466,200 as contended by Mary.

■ B. *The value of Lynn's interest in Lynn Moffatt & Sons Construction Company.* The second corporation in which Lynn has an interest is the Lynn Moffatt & Sons Construction Company. He and Mary formed this business several years before their separation to do earth moving work such as farm terracing. The decree award-

ed Lynn all the stock in this corporation. Lynn provided figures purporting to show this business has a negative net worth. The assets consist mainly of construction equipment subject to substantial encumbrances.

We have very little information from which to decide the value of this corporation. The corporation is a going business with a substantial cash flow, having grossed more than $100,000 in 1975, $75,000 in 1976 and more than $95,000 in 1977. In their March 31, 1976, financial statement, the parties valued their stock in the corporation at $87,000. Lynn contends the corporation lost money most years but acknowledges it had a $10,310 profit in 1977 before taxes and depreciation. In his appellate brief he estimates the value of the corporation at $5,000. We believe this figure is too low, and we find the value of Lynn's interest in this corporation is not less than $25,000.

C. *Lynn's liabilities.* The third major area of dispute relates to the amount of Lynn's claimed liabilities. He fixes his personal liabilities at almost $350,000 whereas the trial court found them to be $209,150.87. We do not know what liabilities the trial court rejected, but have made our own evaluation of them.

Included are $101,841.43 for alleged advances of Moffatt Corporation grain used to feed livestock and $48,555 in cash advances from the corporation. These debts are unsubstantiated by evidence other than Lynn's testimony. Even though the grain advances are alleged to have dated from 1973, neither they nor any cash indebtedness to the Moffatt Corporation is shown on the parties' 1976 financial statement. Nor are they reflected among the assets of the corporation in trial exhibits purporting to list Moffatt Corporation assets. We are skeptical about these asserted debts but have decided to accept them, recognizing they are Lynn's liabilities but assets of the Moffatt Corporation, enhancing the value of his interest in it.

In sum, we accept the figures urged by Lynn regarding his assets and liabilities with the exception of the values he attributes to his interests in the two corporations.

For purposes of this proceeding we value his interest in the Moffatt Corporation at not less than $466,200 and his interest in Lynn Moffatt & Sons Construction Company at not less than $25,000. As a result, we find he had net assets at the time of trial of $415,200, instead of $74,000 as he claims and rather than $690,849.15 as found by the trial court.

II. *The property and alimony awards.* The trial court awarded Mary $300,000 as a property settlement and $750 per month alimony. The property award was payable in six annual installments of $50,000 with interest at seven percent on the unpaid balance.

One of Lynn's principal arguments in alleging these awards are excessive is that they were based on an erroneous view of his net worth. We have found his net worth is less than found by the trial court but much greater than he contends.

His other main argument against these awards is that they are based in substantial part upon assets he acquired by inheritance after this action was started and not by mutual efforts of the parties during the marriage.

The fact that assets were acquired subsequent to the breakdown of a marriage does not preclude their consideration. The net worth of the parties at the time of trial is relevant in adjusting their property rights. *Locke v. Locke*, 246 N.W.2d 246, 252 (Iowa 1976).

Nor does the fact assets were inherited preclude their consideration in making a property or alimony award. *In re Marriage of Beeh*, 214 N.W.2d 170, 175 (Iowa 1974), and citations. The contributions the parties made toward acquiring their assets are an important consideration but not the only one. We adhere to the factors delineated in *Schantz v. Schantz*, 163 N.W.2d 398, 405 (Iowa 1968), except for the fault element. The awards in the present case must be measured against all of those criteria.

These parties were married in 1954. The marriage lasted more than twenty-three years. At the time of trial Lynn was 46 and Mary was 42.

Lynn was educated through two years of college and has an established means of making a good living. Mary has only a high school education, two quarters of college, and no marketable skills.

Lynn is in good health, except for a pinched nerve in his back; Mary has a lumbar disc problem and has suffered from numbness in her legs. She has been advised by her doctor not to work.

During the marriage Mary worked as hard at her tasks as Lynn did at his. She mothered six children and maintained the family home. She did plowing, discing, combining and chores. She worked on machinery, cared for livestock and kept books. She even aided with custom farm work. She kept a garden, canned fruits and vegetables and raised chickens.

Although the parties were only tenants on the elder Moffatts' land, they made contributions to the success of the farming operation and improvement of the land beyond the obligations of tenants. In this way Mary's efforts assisted in preserving and enhancing the value of Lynn's subsequent inheritance. *See In re Marriage of Cook*, 205 N.W.2d 682, 685 (Iowa 1973).

The youngest child is Wesley, age 16 at trial. He has physical and mental disabilities which the parties agree will make him dependent for the rest of his life. Mary has his custody and must provide a home and care for him.

At the time of trial, Mary had purchased a mobile home in Neola, in which she lived with the three children still at home. Using $1100 borrowed from her parents and $900 in a savings account, she made a $2000 downpayment on the home and financed the $6500 balance of the purchase price. She was working for a vocational development center in Council Bluffs, earning take-home pay of $473 per month. In addition, she worked as a cook at a truck stop on weekends, taking home another $160 per month from that job. She testified her monthly expenses were more than $1500.

Lynn had two homes on the farm but was not living there. He did not file a financial statement and his monthly living expenses are not shown.

Considering the relevant *Schantz* criteria, we agree with the trial court that Mary is entitled to substantial property and alimony awards.

In fixing the amounts of these awards we consider their inter-relationship. Lynn's ability to pay substantial alimony and child support depends upon his property holdings. To the extent they are diminished, his ability to pay is reduced. Correlatively, Mary needs substantial payments of periodic alimony. With these considerations in mind, as well as the *Schantz* criteria and our computation of Lynn's net assets, we find Mary's property award should be $150,000 instead of $300,000. The property award shall be payable in six annual installments of $25,000 each, with the first installment due July 1, 1979, and the remaining installments due each July 1 thereafter until fully paid. Interest on the unpaid balance shall accrue at the annual rate of seven percent.

The alimony award provided in the trial court's decree is affirmed. However, it shall terminate upon Mary's remarriage or upon the death of either party.

III. *The child support awards.* The parties' six children are Rhonda, Beth, Peggy, Winston, Amy and Wesley, whose ages were 22, 21, 20, 19, 17 and 16 at the time of trial. Rhonda had graduated from college, and Beth was one quarter away from graduation. She expected to finish her last quarter at Iowa State University in the summer. Peggy was in the second quarter of a two-year course at the American Institute of Business in Des Moines. Winston and Amy were high school seniors. Winston did not plan on college but hoped to go to a trade school; Amy planned to go to college. Wesley was a high school sophomore in special education.

As with Lynn's effort to supplement the record by affidavit showing the estate tax

valuation of his Moffatt Corporation stock, we give no consideration to Mary's effort to add to the record by submitting an affidavit concerning post-trial events affecting the children. We base our decision upon the evidence at trial.

The trial court awarded Mary $250 per month child support for Wesley which, because of his disabilities, was not to terminate at age eighteen. Lynn agrees with this award and it is affirmed.

■ The court ordered Lynn to pay tuition and room and board for Beth and Peggy until completion of four years of college or business school. We modify this award to require Lynn to pay tuition and room and board for Beth for her last quarter at Iowa State University and tuition, room and board of Peggy for the portion of her two-year A.I.B. course remaining after the date of trial, until she completes it or reaches the age of 22.

The decree ordered Lynn to pay all college expenses of Winston and Amy if they attend college. We modify this award to provide he shall pay tuition and board and room for Winston for college or trade school, if he should attend either, until he becomes 22. Lynn shall pay tuition and board and room for Amy, if she attends undergraduate college or vocational school, until she is 22. *See Ward v. Ward*, 226 N.W.2d 812, 814 (Iowa 1975).

These awards for education of the children are subject to the requirements of section 598.1(2), The Code. *See In re Marriage of McFarland*, 239 N.W.2d 175, 180 (Iowa 1976).

The trial court left open the question of child support beyond these sums. We find no such additional support shall be awarded.

Except as modified, the child support provisions of the decree are affirmed.

■ IV. *The refusal to grant an offset against the temporary support default.* Shortly after the petition in this case was filed, the trial court ordered Lynn to pay Mary temporary support of $1250 per month through the office of clerk of court.

He did not comply with this order and was cited for contempt. He did not appear for the contempt hearing, but was found in contempt and his unpaid support obligation was computed as $15,750.

At trial he offered an envelope of cancelled checks into evidence, alleging they proved expenditures of more than $23,000 to or for the children during the period he was obligated to pay temporary support.

No additional explanation of these alleged expenditures was offered, and we are left to speculate about whether they prove what Lynn claims for them. However, that issue is not determinative.

Each installment of temporary support became a judgment when due. *Cullinan v. Cullinan*, 226 N.W.2d 33, 35 (Iowa 1975). It is undisputed that Lynn's default under the order totalled $15,750 at the time of the November 1977 contempt proceeding. Mary was the judgment creditor. He could not satisfy the judgments by payments to or for the children. We find, as did the trial court, that Lynn did not establish any legal or equitable basis for offset against Mary's total judgment. *See Wren v. Wren*, 256 Iowa 484, 127 N.W.2d 643 (1964) (gifts of money to child do not relieve father of liability to former spouse for child support under decree).

We assume, without deciding, that Lynn could assert his right to offset in the present proceeding. *Compare In re Marriage of Welsher*, 274 N.W.2d 369 (Iowa 1979), *with In re Marriage of Fenchel*, 268 N.W.2d 207 (Iowa 1978).

We affirm the trial court's refusal to allow any offset here.

■ V. *The allowance of appellate attorney fees.* Mary's attorney has filed an itemized statement showing his services on this appeal. The requested fee is $7400 plus $444.86 for expenses. Mary requests that Lynn be ordered to pay this fee. He has already paid $1000 toward the fee pursuant to an order entered during the pendency of the appeal. Without fixing the amount of the fee, we order Lynn to pay an additional

$4000 toward Mary's attorney fee for the appeal and $444.86 for expenses. He is also taxed with costs.

Except as modified, the trial court's decree is affirmed.

AFFIRMED AS MODIFIED.