**IN THE COURT OF APPEALS OF IOWA**

No. 17-0534
Filed April 18, 2018

**IN RE THE MARRIAGE OF SHANTEL N. DOW
AND DANIEL D. DOW**

**Upon the Petition of
SHANTEL N. DOW,**
        Petitioner-Appellee,

**And Concerning
DANIEL D. DOW,**
        Respondent-Appellant
_____

        Appeal from the Iowa District Court for Lucas County, David L. Christensen,

Judge.


        Daniel Dow appeals from the support and economic provisions of the

decree dissolving his marriage to Shantel Dow. **AFFIRMED AS MODIFIED.**



        Heather M. Simplot of Harrison, Moreland, Webber & Simplot, P.C.,

Ottumwa, for appellant.

        Bryan J. Goldsmith of Gaumer, Emanuel, Carpenter & Goldsmith, P.C.,

Ottumwa, for appellee.



        Considered by Danilson, C.J., and Vaitheswaran and Bower, JJ.

**DANILSON, Chief Judge.**

Daniel Dow appeals from the support and economic provisions of the decree dissolving his twenty-eight-year marriage to Shantel Dow. He objects to the court ordering him to pay six months of child support for the couple's fourth child. Daniel contends he is unemployed and cannot afford to pay spousal support. He also objects to the terms of the court's qualified domestic relations order (QDRO).

Upon our de novo review, we find no reason to disturb the court's rulings as to spousal support, child support, and the distribution of debts. We modify the order as to the terms of the QDRO, eliminating any requirement that Shantel be identified as a contingent annuitant and the parties' children as contingent alternate payees. We award no appellate attorney fees.

**I. Background Facts and Proceedings.**

This case involves the dissolution of a long-term marriage during which Daniel was the primary wage earner and Shantel was the primary caregiver for the parties' four children. Daniel and Shantel were married in 1988, and they had children born in 1994, 1995, 1997, and 1999. The family moved several times for Daniel's positions as an educator. Daniel obtained his master's degree in school administration in 2002. From 2004 to 2016, Daniel was a school principal in Iowa. He earned $80,922 during the 2015-2016 school year.

Shantel is a college graduate with a degree in liberal studies. She also has taken post-graduate classes in nonprofit management. She has had a number of jobs during the marriage, including as a manager of a youth orchestra, as a grant writer, and (from 2011 to 2014) as the director of Chariton Chamber and

Development. Shantel is also a performing arts booking agent with Dow Artists, Inc., a subchapter S corporation. She was diagnosed with cancer in 2014 and underwent chemotherapy, radiation, and surgery. In February 2015, she was no longer able to continue working for the Chamber. After her cancer treatment, Shantel took classes and obtained a substitute teacher license. She works as a substitute teacher, earning about $100 per day, and continues to book artists and events through Dow Artists.[1] With regard to her income from Dow Artists, Shantel stated the corporation receives a twenty-percent commission of the agreed-upon fee for the event and Shantel "tr[ies] to take [ten] percent off of that commission personally, but there's a lot of times I can't take that much because the business needs to pay bills."

The parties separated in June 2015 and Shantel and the youngest (and only minor) child moved out of the marital residence. At the time of separation, Shantel's source of income was from substitute teaching and Dow Artists. During this period of maintaining separate residences, David paid no child or spousal support.

Shantel filed for dissolution of the marriage on February 3, 2016. She sought child support for the couple's fourth child, who planned to graduate from high school in May 2017. Shantel also asked that Daniel pay permanent spousal support and that the court make an equitable distribution of the parties' assets.

---

[1] As the Chamber director, Shantel earned $30,750 in 2012; $31,500 in 2013; and $27,562.50 in 2014; and in 2015, Shantel received $10,218 in unemployment benefits, $5666 in net profit from Dow Artists, and $1110 in wages.

At trial, Daniel testified his contract with the school was not renewed for the 2016-2017 school year. He was receiving net unemployment benefits of $484 per week. He asserted he is not able to find employment as a principal in the area, and that he and his sons are starting a contracting business. Daniel claimed he could not afford to pay child support or spousal support. He listed monthly living expenses of $3849.

Shantel's four-year average earnings at the time of trial was approximately $26,248 per year. She testified she had "about $500" in an Iowa Public Employees' Retirement System (IPERS) account and about $1400 in a 401k account. She listed monthly living expenses of $3118. Shantel opined Daniel would return to work as an administrator once the dissolution proceedings are complete. Daniel testified his "interest [in doing so] has dropped" and he is "helping [his] eldest son get his feet on the ground in construction."

The parties owned 220 acres of land and a house, which were subject to outstanding loans—$310,518.80 was owed on the loan on the land; $25,980.59 was owed on the loan for a pole barn; and approximately $186,000 was owed on the family residence. Both parties agreed the property and the house should be sold and the net proceeds (anticipated to be about $687,000) evenly distributed.

On November 29, 2016, the district court entered a decree of dissolution and placed the parties' minor child in Shantel's physical care. The court determined Daniel was temporarily unemployed and had a "significantly higher earning capacity than" Shantel. The court determined Daniel had an earning capacity of $72,914.50, and Shantel had an earning capacity of $26,247.75. The court ordered Daniel to pay child support in the amount of $799.64 per month

beginning December 1, 2016, and continuing until the minor child graduated from high school or became emancipated, whichever occurred earlier. The court also ordered Daniel to pay Shantel traditional alimony in the sum of $1000 per month until she turned sixty-six and $500 per month thereafter until either party died. The court ordered the parties' house and property sold and the net proceeds distributed equally. And while Daniel was allowed to continue to reside in the marital home, the court ordered him to be solely responsible for the real estate payments pending the sale.

The court found that under the *Benson* formula, Shantel was entitled to an appropriate percentage of the 168 months of Daniel's retirement benefits—all of which arose during the parties' marriage. The court also ordered Daniel to list Shantel as the death benefit beneficiary and list the parties' four children as contingent alternate payees.

Daniel appeals, asserting Shantel should not have been awarded spousal support and the child-support amount was improperly calculated. He also objects to terms of the ordered QDRO and the court's distribution of debts.

**II. Scope and Standard of Review.**

Dissolution proceedings are tried in equity, and our review is therefore de novo. Iowa Code § 598.3 (2016); *In re Marriage of Mauer*, 874 N.W.2d 103, 106 (Iowa 2016). We give weight to the fact findings of the district court, especially when considering the credibility of witnesses, but we are not bound by them. Iowa R. App. P. 6.904(3)(g). "[W]e accord the trial court considerable latitude in making this determination [of spousal support] and will disturb the ruling only when there

has been a failure to do equity." *In re Marriage of Olson*, 705 N.W.2d 312, 315 (Iowa 2005) (citation omitted); *accord Mauer*, 874 N.W.2d at 104.

**A. Support payments.**

Daniel argues that because Shantel managed without child or spousal support during the parties' separation she does not need it now. He contends she is self-supporting and states, "Shantel was even able to afford to take trips during separation," noting the gross income for Dow Artists in 2015 was $79,845. Daniel suggests we should use Dow Artists's gross income as Shantel's earning capacity.

Shantel testified Dow Artists uses a professional tax preparer. Gross income from a business does not tell the whole story. As a performing arts booking agent, Shantel testified she attends regional booking conferences (the closest one she had attended was in Kansas City), maintains a website, attends showcase performances at state booking conferences if one of her artists is performing, and entertains clients and prospective clients. From the gross earnings of the corporation, expenses must be deducted. In 2015, those expenses were $76,465. She is provided no health insurance or retirement programs through the business.

With respect to the valuation of a business, our court has stated:

> "The purpose of determining value is to assist the court in making equitable property awards and allowances." *In re Marriage of Moffatt*, 279 N.W.2d 15, 19 (Iowa 1979). "The general rule is that stock should be valued at market value if it can reasonably be ascertained." *Id.* However, the valuation of a closely held corporation is difficult, *see In re Marriage of Wiedemann*, 402 N.W.2d 744, 747-49 (Iowa 1987); *In re Marriage of Hitchcock*, 309 N.W.2d 432, 435-36 (Iowa 1981), and the market value of stock in a closely-held corporation can rarely be ascertained, *Moffatt*, 279 N.W.2d at 19. Because of the difficulty of the task of valuation, the law provides much leeway to the trial court, even permitting the trial court to devise its own scheme for valuation. *See Hitchcock*, 309 N.W.2d at 435.

*In re Marriage of Dennis*, 467 N.W.2d 806, 808 (Iowa Ct. App. 1991). While Daniel takes issue with a few of the expenses Shantel claimed as business expenses, the

trial court's assessment of Shantel's earning capacity is within the range of the evidence and we will not disturb the finding on appeal.

To determine a spousal support award, "Iowa courts 'are compelled to follow the traditional multifactor statutory framework set' forth in Iowa Code section 598.21A." *Mauer*, 874 N.W.2d at 107 (citation omitted). Under Iowa Code section 598.21A(1), a court

> may grant an order requiring support payments . . . for a limited or indefinite length of time after considering all of the following:
>> (a) The length of the marriage.
>> (b) The age and physical and emotional health of the parties.
>> (c) The distribution of property made pursuant to section 598.21.
>> (d) The educational level of each party at the time of marriage and at the time the action is commenced.
>> (e) The earning capacity of the party seeking maintenance, including educational background, training, employment skills, work experience, length of absence from the job market, responsibilities for children under either an award of custody or physical care, and the time and expense necessary to acquire sufficient education or training to enable the party to find appropriate employment.
>> (f) The feasibility of the party seeking maintenance becoming self-supporting at a standard of living reasonably comparable to that enjoyed during the marriage, and the length of time necessary to achieve this goal.
>> (g) The tax consequences to each party.
>> (h) Any mutual agreement made by the parties concerning financial or service contributions by one party with the expectation of future reciprocation or compensation by the other party.
>> (i) The provisions of an antenuptial agreement.
>> (j) Other factors the court may determine to be relevant in an individual case.

Here, the district court properly considered the statutory factors and made these findings, which we adopt as our own:

> In this case, the claim is for traditional alimony. The parties had a [twenty-eight] year marriage. It is the first marriage for each party. [Daniel] has significantly higher earning capacity than [Shantel]. [Shantel], while maintaining two jobs at present, is not likely to be able to guarantee maintaining those jobs in the indefinite

future. At the same time, [Daniel] is presently temporarily unemployed. It is undisputed that [Daniel] is a very good school principal and school administrator. Considering his work history and the demand for principals and school administrators, [Daniel], if motivated, should soon be re-employed as a school principal at or above his prior 2015 annual income. It is unlikely that [Shantel] can maintain the standard of living she did during the marriage without some support from [Daniel], but support that is set too high will deprive [Daniel] of that same opportunity. At the same time, [Shantel]'s social security benefits will be substantially lower than [Daniel]'s. On consideration of all of these factors, the court concludes that [Daniel] should be ordered to pay alimony to [Shantel] in the amount of $1000.00 per month commencing December 1, 2016, and continuing until [Shantel] attains the age of 66. Thereafter, alimony will reduce to $500.00 per month. Alimony is payable until the death of either party. If [Shantel] remarries, her remarriage is a factor that may justify a modification or elimination of the alimony award.

We find no failure to do equity in the trial court's rulings. Shantel was fifty-three years of age at the time of trial and a self-employed cancer survivor. She has few retirement benefits of her own. Daniel was fifty-three and healthy. Daniel had been the primary wage earner in this twenty-eight year marriage, while Shantel had been the primary caregiver for their four children.

Daniel argues his current income for purposes of spousal and child support is limited to the unemployment benefits he was receiving. The trial court was not convinced. Nor are we. *See In re Marriage of Malloy*, 687 N.W.2d 110, 115 (Iowa Ct. App. 2004) ("When a parent voluntarily reduces his or her income or decides not to work, it may be appropriate for the court to consider earning capacity rather than actually earnings when applying the child support guidelines."). Given the length of the marriage and the disparity in earning capacities, the court's award of spousal support was equitable. *See In re Marriage of Gust*, 858 N.W.2d 402, 410 (Iowa 2015) ("[O]ur caselaw demonstrates that duration of the marriage is an

important factor for an award of traditional spousal support. Traditional spousal support is often used in long-term marriages where life patterns have been largely set and 'the earning potential of both spouses can be predicted with some reliability.'" (citation omitted)).

In her February 3, 2016 petition Shantel requested an award of child support and also sought an award of temporary child support.[2] For purposes of child support, when determining net income, we use the most reliable evidence presented. *In re Marriage of Powell*, 474 N.W.2d 531, 534 (Iowa 1991). "This often requires the court to carefully consider all of the circumstances relating to the parent's income," which can include whether a parent voluntarily reduced his or her income. *Id.* Daniel contends he did not voluntarily reduce his income. Yet, the trial court found that "if motivated, [he] should soon be re-employed as a school principal at or above his prior 2015 annual income." In *In re Marriage of Duggan*, 659 N.W.2d 556, 562 (Iowa 2003), the supreme court rejected an argument by a father who asserted his child support should be calculated based not on his pension benefits but on his actual earnings of zero dollars due to his retirement. The supreme court held it would be inappropriate to do so because the father "offered no reason for his failure to obtain employment other than his desire to be retired." *See Duggan*, 659 N.W.2d at 562. The court further found the father did not suffer from any ailments or disabilities that would prevent him from earning

---

[2] There is no indication an order of temporary support was entered. *See Bork v. Richardson*, 289 N.W.2d 622, 625 (Iowa 1980) ("We believe, however, that in balancing the policy considerations it is preferable to provide temporary support pending the outcome of the case, even if it is later determined that a preponderance of the evidence did not support it. Our concern about such occasional injustice is outweighed by our concern that parties affected by dissolution actions, especially children, be adequately provided for while awaiting a final decision.").

income as he did before his retirement. *See id.* It thereby determined the father's choice to remain unemployed was voluntary. *See id.* Daniel is in a similar position as the father in *Duggan*. "Under our case law, 'a party may not claim inability to pay child support when that inability is self-inflicted or voluntary.'" *Id.* (quoting *In re Marriage of Foley*, 501 N.W.2d 497, 500 (Iowa 1993)). We also note that the decree was entered in November 2016 and Daniel's child-support obligation began December 1, 2016, continuing monthly until the child graduated from high school, which was expected to be May 2017. We find no reason to alter the order for this limited period of child support.

**B. Debt.**

Daniel next complains he should not have been required to pay the debt of marital real estate until sold and should not have been solely responsible for the remainder of his school-loan debt.

At the time of trial and since separation, Daniel was living in the marital residence. In 2015, Shantel had set up a separate household and had been supporting the minor child unassisted financially by Daniel. Pursuant to the decree, Shantel received property with a value of $3300. She was responsible for her personal and household debts. Daniel received personal property with a net value of $13,500. The marital property was to be sold as soon as possible and the parties were to split the net proceeds equally. Under these circumstances, we find no reason to disturb the trial court's order that Daniel be responsible for the real-estate debts until the property was sold or for the remainder of the loans from his master's degree.

**C. Division of retirement benefits.**

It was undisputed that all of Daniel's IPERS benefits accumulated during the marriage.[3] Daniel asserts the trial court erred in its division of his IPERS benefits and in the terms of the QDRO. The court ordered:

> [Shantel] shall be entitled to the appropriate percentage of [Daniel]'s IPERS benefits, computed using the *Benson* formula,[4] payable on a monthly basis during the life of [Daniel], *including all dividends, cost of living increases, and other post retirement benefit increases. [Daniel] shall list [Shantel] as the death benefit beneficiary and contingent annuitant of his IPERS benefits on his beneficiary designation form filed with IPERS. [Daniel] shall name the parties' four children as IPERS contingent alternate payees in equal amounts.*
>
> [Shantel's] counsel shall prepare a Qualified Domestic Relations Order. It shall be approved as to form by [Daniel]'s counsel and shall then be submitted to IPERS. Each party shall cooperate in providing the [Shantel]'s counsel with information concerning the preparation of the Qualified Domestic Relations Order.

(Emphasis added.)

Daniel objects to the italicized portion of the award. In a post-trial motion, Daniel urged the court to remove those terms or, in the alternative, consider the additional post-marital increases and death benefits as being in lieu of spousal support. On appeal, Daniel asserts—incorrectly—that Shantel did not request that she receive survivorship benefits. Shantel testified Daniel was no longer contributing to the IPERS account at the time of trial because he was not then employed. She did request she be the named the beneficiary in the event Daniel predeceased her. She argues that should Daniel die prematurely, she would receive nothing from the IPERS award.

---

[3] Although the record contains no statement of the contributions to or the value of Daniel's IPERS account.

[4] *In re Marriage of Benson*, 545 N.W.2d 252 (Iowa 1996).

Pension plans are divisible marital property. *In re Marriage of Sullins*, 715 N.W.2d 242, 247 (Iowa 2006). IPERS is a defined-benefit plan, which uses a "*percentage of earnings per year of service* formula, which provides a benefit that is related to the employee's earnings and length of service." *Benson*, 545 N.W.2d at 254-55. As stated in *Benson*, "Because payment is deferred, if we 'lock in' the value of [the nonpensioner spouse]'s interest at the time of dissolution, it would prevent her from earning a reasonable return on her interest." *Id.* at 257 (citing *In re Marriage of Fuchser*, 477 N.W.2d 864, 868 (Iowa Ct. App. 1991) (opinion concurring in part and dissenting in part) (noting that locking in the value of the pension benefit at the time of initial vesting would inequitably deprive the pensioner's spouse of cost-of-living increases)). "To prevent this occurrence it is preferable to set the value of the benefit for purposes of the equation at the time of maturity." *Id.*

The use of the *Benson* formula alone, without recitation of "including all dividends, cost of living increases, and other post retirement benefit increases" will clearly encompass any dividends, interest, and other increases until "maturity."[5] *Cf. In re Marriage of Smock*, No. 07-1081, 2007 WL 4553658, at *4 (Iowa Ct. App. Dec. 28, 2007) (affirming the award of cost-of-living-adjustments and a seventy-five percent survivor benefit to former spouse of firefighter). On the other hand, the *Benson* formula never intended to encompass "post-retirement increases," and

---

[5] As noted above, in discussing the methods of dividing a pension, the majority in *Benson* noted it was inequitable to prevent the divorced spouse from receiving cost-of-living expenses on her share and, thus, it was better to set the value of the benefit at the time of maturity. 545 N.W.2d at 257. Consequently, the reference to dividends and cost-of-living increases in the decree apparently only pertains to post-retirement dividends and cost-of-living increases.

we are not sure what increases this recitation may relate to other than dividends or cost-of-living increases pursuant to Iowa Code section 97B.49F(1) because IPERS is a defined benefit plan.[6]  Daniel has not shown how awarding Shantel any such increases, as applied to her share of the IPERS, would be inequitable to him. We find no reason to modify the decree's award of such increases.

In response to Daniel's objections as to "survivorship" benefits, Shantel cites *Duggan*, 659 N.W.2d at 561, and asserts, "It is normal and typical to award survivorship benefits to a spouse in a dissolution of marriage action when those survivorship benefits are necessary to protect the party's interest in the pension." That premise is inflated.

*Duggan* was dealing with the division of fire and police retirement system pension benefits, under which "a former spouse is not considered a 'surviving spouse' unless 'the division of assets in the dissolution of marriage decree . . . grants the former spouse rights of a spouse.'"  659 N.W.2d at 560 (quoting Iowa Code § 411.1(19) (2001) [now found at Iowa Code § 411.1(22) (2018]).  In *Duggan*, the supreme court found a nonpensioner spouse was entitled to survivorship rights for the first ten years of the pensioner spouse's retirement, but explained "the circumstances under which that designation should occur depend on the facts of each case and whether the allowance of survivorship rights effectuates an equitable distribution of the parties' assets."  *Id.*  Thus, while spouse survivorship

---

[6] We acknowledge Iowa Code section 97B.48A may permit an increase in benefits where a retired member receiving benefits becomes reemployed.  We suspect there is also the possibility the legislature could grant further increases in benefits but Iowa Administrative Code rule 495-16.2(2)(b)(5) prohibits QDRO's from awards of future benefit increases by the legislature except specified dividends and cost-of-living increases.

rights may be awarded to ensure the spouse receives a share of the pension plan in the event of the employee spouse's untimely death, we cannot say such an award is "normal and typical." *See In re Marriage of Morris*, 810 N.W.2d 880, 887 (Iowa 2012) (noting some courts—but not Iowa courts—have adopted a default rule that dividing retirement benefits includes survivorship benefits). The survivorship rights as a contingent annuitant are significant property rights that must be bargained for or otherwise explicitly resolved at trial by the district court. *See id.* (noting these rights related to retirement benefits are separate and subject to negotiation).

In *In re Marriage of Smith*, No. 16-0597, 2017 WL 362000, at *6 n.11 (Iowa Ct. App. Jan. 25, 2017), this court declined a nonpensioner spouse's request that she be designated as a surviving spouse, noting "the *Benson* court stated the percentage formula 'properly allocates the risk between the parties.'"

Notwithstanding, here, due to the length of this marriage and Shantel's need for retirement funds, we agree Shantel should have survivorship rights to fifty percent of any death benefit the law may provide if Daniel dies before his first month of entitlement. *See* Iowa Code § 97B.52. A QDRO (or an amended QDRO) shall be prepared requiring Daniel to designate Shantel as beneficiary of said share. We disagree that Daniel should be required to identify Shantel a contingent annuitant or the parties' children as contingent alternate payees because Shantel is sufficiently protected by the other pension provisions, and because we only have authority to divide the pension between the spouses. *See* Iowa Code § 598.21. We modify the decree accordingly.

**D. Appellate Attorney Fees*.***

An award of appellate attorney fees is not a matter of right but rests within this court's discretion. *In re Marriage of Berning*, 745 N.W.2d 90, 94 (Iowa Ct. App. 2007). In determining whether to award attorney fees on appeal, we consider the needs of the party making the request, the ability of the other party to pay, and whether the party making the request was obligated to defend the district court's decision on appeal. *Id.* We decline to award attorney fees here.

Costs on appeal shall be assessed to Daniel.

**AFFIRMED AS MODIFIED.**