**IN THE COURT OF APPEALS OF IOWA**

No. 24-0394
Filed May 21, 2025

**IN RE THE MARRIAGE OF JEFFREY J. HOWE
AND LEE ANNE HOWE**

**Upon the Petition of
JEFFREY J. HOWE,**
        Petitioner-Appellee,

**And Concerning
LEE ANNE HOWE n/k/a LEE ANNE MCCOLL,**
        Respondent-Appellant.
_____

        Appeal from the Iowa District Court for Polk County, Scott D. Rosenberg,

Judge.


        Lee Anne McColl appeals the economic provisions of the decree dissolving

her marriage to Jeffrey Howe.  **AFFIRMED AS MODIFIED.**


        Anjela A. Shutts and Taylor J. Mikel of Whitfeld & Eddy, P.L.C., Des Moines,

for appellant.

        Andrew B. Howie of Shindler, Anderson, Goplerud & Weese, P.C., West

Des Moines, for appellee.


        Considered without oral argument by Schumacher, P.J., and Chicchelly and

Sandy, JJ.

**CHICCHELLY, Judge.**

Lee Anne McColl[1] appeals the economic provisions of the decree dissolving her marriage to Jeffrey Howe. She challenges the division of the proceeds from the sale of the marital home, the amount and duration of the spousal support award, and the award of stock in Jeffrey's family business to Jeffrey. She is also asking for an award of appellate attorney fees. We modify the decree to increase Lee Anne's property award by $6500 but otherwise affirm.

**I. Background Facts and Proceedings.**

Jeffrey and Lee Anne met and married in 2015. This is Lee Anne's fourth marriage and Jeffrey's second. Lee Anne has no children, while Jeffrey has three children with his ex-wife, with whom he shared joint physical care. The children were adults at the time of the trial.

Jeffrey is senior vice president and minority owner of Mack McClain & Associates (MMA), a wholesale supplier of plumbing products. Lee Anne worked in South Carolina as a sales manager in the beauty-care industry before marrying Jeffrey and moving to Iowa. She worked part-time in sales for about six months early in the marriage but agreed to a traditional marriage in which she would take care of his three children while Jeffrey worked. Lee Anne then obtained her real estate license and started a real estate business.

At the start of the marriage, the parties lived in a West Des Moines home that Jeffrey bought in 2012. Over the years, Jeffrey made extensive improvements to the home. When Jeffrey sold the home in 2018, he netted about $275,000 in

---

[1] Known as Lee Anne Howe during the marriage, the dissolution decree returned Lee Anne to her maiden name.

proceeds from the sale. Jeffrey used those proceeds for a down payment on a home he and Lee Anne bought in Panora for about $697,000. They sold that home for $1,500,000 in 2023 with Lee Anne acting as the real estate agent and broker, earning a commission of $54,000.

Jeffrey petitioned to dissolve the marriage in 2023. After trial, the district court entered a decree dissolving the marriage, dividing the parties' assets and ordering Jeffrey to pay Lee Anne spousal support in the amount of $3000 per month for one year. Lee Anne appeals.

**II. Scope of Review.**

We review dissolution proceedings de novo. *In re Marriage of Mauer*, 874 N.W.2d 103, 106 (Iowa 2016). We give weight to the district court's fact findings although they are not binding. *Id.*

**III. Discussion.**

Lee Anne challenges property division and spousal support provisions of the dissolution decree. She also asks us to order Jeffrey to pay her attorney fees and the costs of the appeal.

**A. Property Division.**

We begin by reviewing the property division set out in the dissolution decree. Using the criteria set out in Iowa Code section 598.21(5) (2023), the court must divide all the parties' property equitably. *In re Marriage of Miller*, 966 N.W.2d 630, 635–36 (Iowa 2021). An "equitable distribution of marital property" is different from "an equal division of assets." *Id.* (citation omitted). Although inherited property or gifts received by one party are not typically included in the property

division, they can be divided if the court determines that failing to do so would be inequitable to the other party. *Id.* (citing Iowa Code § 598.21(6)).

> Section 598.21(1) requires all property, except inherited property or gifts received by one party, to be equitably divided between the parties. We have previously held this broad declaration means the property included in the divisible estate includes not only property acquired during the marriage by one or both of the parties, but property owned prior to the marriage by a party. The district court may not separate a premarital asset from the divisible estate and automatically award it to the spouse that owned the property prior to the marriage. Instead, property brought to the marriage by each party is merely one factor among many to be considered under section 598.21.

*In re Marriage of Fennelly & Breckenfelder*, 737 N.W.2d 97, 102 (Iowa 2007) (cleaned up).

**1. Home sale proceeds.**

Lee Anne challenges the district court's decision to award Jeffrey a greater portion of the proceeds from the sale of the Panora home. From total net proceeds of over $1,000,000, the court awarded Jeffrey about $600,000 and awarded Lee Anne about $415,000. The difference in the amount awarded reflects the court's view of each party's contribution to the Panora home. It found that Jeffrey contributed about $300,000 to the down payment on the Panora home and credited Lee Anne $120,000 for her efforts in redesigning and remodeling the home. Lee Anne complains that she should receive a larger portion of the equity based on her contributions.

Lee Anne testified that she redesigned the kitchen and managed the remodeling, hung wallpaper in the master bathroom, and installed a new runner on the staircase. She was present during the remodeling while Jeffrey was at work, and she also planted more than one hundred trees, shrubs, and plants. Lee

Anne also testified to the work she did to stage the home for sale. The staging includes "[m]owing the grass, making sure that the yard was good, clearing debris and whatnot out of the yard," "put[ting] new mulch down, new flower beds so it would have great curb appeal, and just making sure it would be ready to show at a moment's notice."

The record shows both parties contributed to the value of the Panora home. The proceeds from the sale of Jeffrey's West Des Moines home provided a considerable down payment on the Panora home, while Lee Anne's skill and labor no doubt helped increase the home's value.[2] Although the court awarded Jeffrey $187,000 more than Lee Anne to reflect that financial contribution to the home's purchase, it did not reimburse Jeffrey the total amount of premarital funds in recognition of Lee Anne's nonfinancial contribution. *Cf. Fennelly*, 737 N.W.2d at 103–04 (emphasizing that contributions to a marriage cannot be reduced to dollar amounts and financial contributions must not be valued above other contributions in determining what is equitable). The district court performed the difficult task of weighing and comparing the parties' distinct contributions on the same scale. We cannot say it acted inequitably in doing so. We find the division of the sale proceeds is equitable under the facts before us.

---

[2] Most of the down payment came from the net proceeds of the sale of Jeffrey's West Des Moines home, which is premarital property. Jeffrey testified that he also contributed $18,000 came from his salary. Although Lee Anne claims that she helped increase the value of the West Des Moines home, the record shows that most of the improvements occurred before the parties married.

**2. Corporate stock.**

Lee Anne next challenges the provision awarding Jeffrey shares of corporate stock. There are two categories of stock involved. The first is stock in MMA, Jeffrey's employer. The other is stock in three corporations that are closely associated with MMA as each owns real property from which MMA operates.

**a. MMA stock.**

MMA is a closely held corporation owned by Jeffrey's uncle. Jeffrey has worked for MMA since 1993. Jeffrey's uncle began giving Jeffrey shares of MMA stock in the 2000s with the last transfer in 2013. Jeffrey cannot sell his shares to anyone outside the company, and the company will buy his shares if he leaves MMA. The stock's value roughly doubled during the marriage, increasing from about $500,000 to more than $1,000,000.

Jeffrey owned 2600 shares of stock at the time of dissolution. Citing Jeffrey's testimony that he received two shares of stock per year, Lee Anne argues that only twenty-four shares are premarital property. Lee Anne assumes that Jeffrey received the remaining 2576 shares during the marriage. On this basis, she argues she is entitled to one-half the increase in the value of those shares.

The problem with Lee Anne's argument is that the premise is false. It is clear from the record that Jeffrey received all 2600 shares before his marriage to Lee Anne as the last transfer was in 2013. The discrepancy in the number of shares comes from a split in the stock that occurred in 2013, which increased Jeffrey's shares from twenty-six to 2600. We agree with the district court that under these facts, it was equitable to award Jeffrey the premarital shares of the MMA stock.

**b. Associated corporations.**

During the marriage, Jeffrey received shares of stock in the three corporations that are closely associated with MMA. Each corporation owns one building from which MMA leases space. Jeffrey paid $10,000 for his investment in one while MMA paid him a bonus to cover his investment in the other two. He also signed an agreement stating that if he leaves his employment with MMA, he will sell his shares back to each company for $1000 regardless of the equity value. The court awarded Jeffrey the shares in all three corporations.

Lee Anne does not claim that she should receive a share of the corporate stock. She instead argues that the value of the stock should be included in the property division. But she does not provide a valuation of the stock.

Although the general rule is to value stock at market value if it can be reasonably determined, our supreme court has recognized that "market value for the stock in a close corporation can rarely be ascertained." *In re Marriage of Moffatt*, 279 N.W.2d 15, 19 (Iowa 1979). The court can calculate the value from a broad range of evidence, including evidence of the corporation's assets and liabilities. *Id.* But the court need not determine an exact value. *Id.* "The purpose of determining value is to assist the court in making equitable property awards and allowances. This can be done without putting a precise value on the stock of a closely held corporation." *Id.* We have also recognized that "restrictions on marketability and legal restrictions on sale can justify a discount of the stock." *In re Marriage of Hogeland*, 448 N.W.2d 678, 681 (Iowa Ct. App. 1989). The amount to be paid under a stock redemption agreement is one factor in assessing the stock's value. *Id.*; *Moffatt*, 279 N.W.2d at 18. "While the trial court cannot rely

upon its own knowledge or speculate concerning the value of the stock, the court may look at the broad range of the evidence affecting value and may arrive at something other than an exact value in making an equitable property award and allowance." *In re Marriage of Hoak*, 364 N.W.2d 185, 193 (Iowa 1985) (internal citation omitted).

It is hard to determine the value of Jeffrey's interest in each company as the stock is not publicly traded. Lee Anne introduced evidence of the appraised value of the property owned by each company, but each property is encumbered by a mortgage. Although there is some equity in each property, the net value of that equity is unknown. The only evidence we have on which to evaluate their value is that Jeffrey paid $10,000 out of pocket for his interest and the agreement that each corporation will buy back Jeffrey's shares for $1000 if he leaves MMA. Adding the $10,000 payment made from marital funds to the $3000 for the buy-back amounts gives us a total value of the stock is $13,000. It is equitable to credit Lee Anne for one-half that amount, which totals $6500. By doing so, we recognize that the opportunity to acquire these shares was solely based on Jeffrey's employment, which began more than twenty years before his marriage to Lee Anne. *See In re Marriage of Dieger*, 584 N.W.2d 567, 569 (Iowa Ct. App. 1998) (crediting a husband's devotion as a long-time employee of a closely held corporation for "many years before the marriage" with providing "the rare opportunity" to buy stock in the corporation and considering that contribution in determining the wife's equitable interest in the stock).

Based on the foregoing, we modify the provisions of the decree dividing the parties' assets to require Jeffrey to pay Lee Anne an additional $6500.

**B. Spousal Support.**

We next turn to the spousal support provisions of the dissolution decree, which require Jeffrey to pay Lee Anne $3000 per month for one year. Lee Anne challenges both the amount and duration of the award. She argues it is equitable to award her $7500 per month for a period of seventy-two months.

An award of spousal support is not an absolute right but depends on the circumstances of each case. *In re Marriage of Schenkelberg*, 824 N.W.2d 481, 486 (Iowa 2012). Iowa Code section 598.21A(1) lists the factors the court must consider in determining whether to award spousal support. *In re Marriage of Mann*, 943 N.W.2d 15, 20 (Iowa 2020). Those factors include the length of the marriage, the parties' age and health, the property distribution, the earning capacity of the party seeking maintenance, and the feasibility and time that it would take that party to become self-supporting at a standard comparable to that enjoyed during the marriage. *See* Iowa Code § 598.21A(1). We give the trial court considerable latitude in awarding spousal support because it is in the best position to balance the parties' needs. *In re Marriage of Gust*, 858 N.W.2d 402, 406 (Iowa 2015). We intervene only if the award fails to do equity. *Id.* at 416.

In awarding Lee Anne spousal support, the district court cited the "substantial amount of assets and limited debts and financial obligations" she was receiving, the length of the marriage and Lee Anne's contributions to it, and her health, education, and future earning capacity. It then determined that an award of transitional support would be appropriate.

> [T]ransitional alimony is appropriate when a party capable of self-support nevertheless needs short-term financial assistance to transition from married to single life. Transitional alimony is not

> needed when the recipient has sufficient income or liquid assets to facilitate the change to single life. We decline to require a showing of undue hardship and instead rely on district courts to do equity when awarding transitional alimony to "bridge the gap" from married to single life.

*In re Marriage of Pazhoor*, 971 N.W.2d 530, 545 (Iowa 2022). Generally, an award of transitional spousal support should not exceed one year in duration. *In re Marriage of Sokol*, 985 N.W.2d 177, 187 (Iowa 2023).

Lee Anne argues that rehabilitative support is more appropriate than transitional support. The purpose of rehabilitative support is to allow an economically dependent spouse a period of re-education or retraining to allow for self-sufficiency. *Id.* at 185. The duration of rehabilitative support may vary depending on the realistic needs of the economically dependent spouse. *Id.* at 186.

The record shows that Lee Anne has a degree in elementary education but has never worked in that field. Instead, Lee Anne worked as a sales manager in the beauty-care industry before marrying Jeffrey. Between 2009 and 2015, her earnings typically fluctuated between $60,000 and $80,000 per year.[3] Lee Anne testified that she stopped working in sales shortly after she married Jeffrey because he wanted "a traditional marriage" in which she would "take care of his children while he worked," and she "was totally fine with that." She also testified that her physical health prevents her from returning to the work she did before the marriage, which requires a great deal of travel.

---

[3] In 2010, Lee Anne earned roughly twice as much as she did in other years. She testified that the company she worked for restructured after that year, decreasing her sales territory and earnings. Although Lee Anne earned $60,000 in 2015, she quit working about halfway through that year.

In 2018, Lee Anne began studying for a real estate license. For two years, she worked as a sales representative at a real estate company, giving 40% of her sales commissions to the broker. After those two years, she was eligible for a real estate broker license. Lee Anne obtained her broker license and started her own real estate business. In 2021, she earned a gross income of about $28,000 for a net profit of about $12,000. In 2022, she earned a gross income of about $38,500 for a net profit of about $21,500. At the October 2023 trial, Lee Anne testified that she had only sold two homes so far that year, though one was the Panora home for which she earned a $54,000 commission.

Lee Anne testified that she plans to move to North Carolina, obtain her real estate broker's license there, and sell real estate in the small town where her parents live. To do so, she again must work as a sales representative for two years before obtaining her license and opening a business. Lee Anne also testified that the median value of houses in that area of North Carolina is $150,000, considerably less than the $1,000,000 median value of the houses she sold in Panora.

Based on the above, we find that rehabilitative support is unwarranted. *Id.* (stating that rehabilitative support is not appropriate if there is no showing that a period of re-education or training is necessary). During the marriage, Lee Anne transitioned to a career in real estate and completed the necessary training and education to obtain her broker license and open her own business. Lee Anne's venture succeeded enough that at the time of trial, Lee Anne employed three people and received a percentage of their sales commissions. Although Lee Anne must go through another period of education and training if she moves to North

Carolina and may earn less there, spousal support turns on earning capacity rather than actual income. *See Pazhoor*, 971 N.W.2d at 543. The evidence suggests that Lee Anne could support herself in the real estate industry at the time of dissolution.

We agree that transitional support is more appropriate on the facts before us. *Sokol*, 985 N.W.2d at 187 ("Transitional spousal support addresses short-term liquidity needs associated with splitting one household into two; whereas rehabilitative spousal support addresses training, education, work-readiness, and human capital development."). Considering Lee Anne's earning capacity and the division of property, we find that the district court's award of $3000 per month for a period of one year is equitable.

**C. Appellate Attorney Fees and Costs.**

Finally, Lee Anne asks us to award her attorney fees and the costs of the appeal. Appellate attorney fees are not a matter of right. *In re Marriage of McDermott*, 827 N.W.2d 671, 687 (Iowa 2013). We may award appellate attorney fees based on the needs of the party seeking the award, the other party's ability to pay, and the merits of the claims made on appeal. *Id.* We decline to award appellate attorney fees and assess the costs of the appeal to Lee Anne.

**AFFIRMED AS MODIFIED.**